IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Arlean K. Brown, *as the Personal Representative of Melvin K. Lawhorn*, | ) ) ) | C/A No.  3:14-1188-JMC-PJG |
| Plaintiff, | ) ) | |
| v. | ) ) ) | **REPORT AND RECOMMENDATION** |
| Brian Elliot; Jim Matthews, *both individually and in his official capacity as the Sheriff of Kershaw County*; Kershaw County Sheriff's Office; and Kershaw County, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

The plaintiff, Arlene K. Brown, as the personal representative of the estate of Melvin K. Lawhorn, filed this civil rights action pursuant to 42 U.S.C. § 1983 against the named defendants after Defendant Brian Elliot[1] of the Kershaw County Sheriff's Office fatally shot the plaintiff's decedent during a traffic stop. The plaintiff also asserts various state law claims.[2]  This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for a Report and Recommendation on the defendants' motion for summary judgment (ECF No. 28). The plaintiff filed a response (ECF No. 36), and the defendants replied (ECF Nos. 37 & 39). Having reviewed the parties' submissions and the applicable law, the court concludes that the defendants are entitled to summary judgment on the plaintiff's federal constitutional claims and her state law claims should be remanded to state court.

---

[1] This defendant is more correctly identified as "Brian Elliott." (See Elliott Dep., ECF No. 28-2 at 1.)

[2] The defendants removed this action from the Richland County Court of Common Pleas.

Page 1 of 20



**BACKGROUND**

The following facts are either undisputed or are taken in the light most favorable to the plaintiff, to the extent they find support in the record. On February 28, 2012, Melvin Lawhorn was a passenger in a Ford Ranger pickup truck being driven by Darryl Herbert. Kershaw County sheriff's deputies had received information from a reliable confidential informant that Lawhorn would be purchasing a large quantity of cocaine near Rembert, South Carolina and transporting it to a location on James West Road. The confidential informant provided the license number and description of the vehicle in which Lawhorn would be traveling, described the route the vehicle would be taking, and stated that he would notify officers when Lawhorn was en route. Officers, including but not limited to Officers Elliott, Threatt, and Sellers, set up a perimeter around the anticipated route.

While conducting this surveillance, Officer Elliott saw the target vehicle pass his location and observed it commit minor traffic infractions including speeding and crossing the center line; he therefore initiated a traffic stop, activating his blue light. Herbert, the driver of the truck, "kept going, kept going, kept going," indicating he was hesitant to stop. Officer Elliott summoned Officers Threatt and Sellers to the scene.

Herbert finally stopped the truck and Officer Elliott parked behind it and approached the truck from the passenger side where the window was halfway down. Officer Sellers parked behind Officer Elliott's car and Officer Threatt parked next to it. The truck's engine was still running when Officer Elliott approached, and Herbert testified that his foot remained on the accelerator. All eyewitnesses agree that Lawhorn pushed Herbert toward the driver's side door and moved over to the driver's side, grabbing the steering wheel, and attempted to put the car in drive. (Elliott Dep. 42:11-43:18, ECF No. 28-2 at 25; Herbert Dep. 66:8-23, ECF No. 28-4 at 13; Threatt Dep. 33:10-22,



ECF No. 28-5 at 4.)  Herbert testified that he kept his left foot on the brake and struggled with Lawhorn for control of the vehicle, telling Lawhorn to stop.  (Herbert Dep. 21:9-17, 72:4-24; ECF No. 28-4 at 8, 15.)  Officers gave verbal commands to Herbert and Lawhorn of "freeze" and "don't move."  (Id. 15:3-14, ECF No. 28-4 at 4.)  Officer Elliott then reached inside the truck to grab Lawhorn.  The truck began to move forward.

Although the plaintiff disputes Elliott's version of the following events, according to Elliott, he ran alongside the truck yelling commands to stop while grabbing at Lawhorn.  Eventually Elliott lost his footing and was being dragged involuntarily by the truck.[3]  Elliott pulled his firearm from its holster and fired one shot into the vehicle.  He then fell away from the truck, which ran over his leg and foot.

Officer Threatt pursued the fleeing truck in his vehicle and ultimately brought it to a halt by pushing it off the road into a ditch a couple of hundred feet down the road.  Threatt observed that Lawhorn did not exhibit any signs of life and Lawhorn was later pronounced dead.  Officer Elliott received medical attention and was found to have suffered no bruises, cuts, scrapes, ligament injuries, or broken bones.

The Kershaw County Sheriff's Office requested that the South Carolina Law Enforcement Division ("SLED") investigate the shooting.  A SLED agent investigated and prepared a report. The Fifth Judicial Circuit Solicitor reviewed the SLED file and also issued a report, which found no criminal wrongdoing by Officer Elliott.

---

[3] Although the plaintiff disputes this testimony and has presented expert testimony purporting to refute it, the court observes the defendants have introduced photographic evidence of scuff marks in the dirt that the defendants contend support Elliott's testimony that he was dragged.  (See, eg., ECF Nos. 28-9, 28-10, 28-11, 28-12, 28-13, & 28-19.)



**DISCUSSION**

A.     **Summary Judgment Standard**

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Rule 56 mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.

The moving party has the burden of proving that summary judgment is appropriate. Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(c), (e); Celotex Corp., 477 U.S. at 322.

In determining whether summary judgment should be granted, "[t]he court 'must perform a dual inquiry into the *genuineness* and *materiality* of any purported factual issues.' " Drewitt v. Pratt, 999 F.2d 774, 778 (4th Cir. 1993) (quoting Ross v. Commc'ns Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985)). " 'As to materiality, the substantive law will identify which facts are material[,]' " . . . "[w]hile '[g]enuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice.' " Id. (quoting Anderson, 477 U.S. at 248; Ross, 759 F.2d at 364).

B.     **Federal Claims Under 42 U.S.C. § 1983**

   1.     **"Persons" Under § 1983**

Initially, the court finds that several of the named defendants are not "persons" under § 1983, and accordingly, the plaintiff's § 1983 claims against them must fail as a matter of law. Defendants Brian Elliott and Sheriff Matthews in their official capacities and Defendant Kershaw County Sheriff's Office are not "persons" within the meaning of § 1983 because they are arms of the state. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983."); Monell v. Dep't of Soc. Servs., 436 U.S. 658, n.54 & n.55 (1978) (providing that, in holding that municipalities may be held liable under § 1983 in limited circumstances, such a holding is limited to local government units and local government officials that are not considered part of the state for Eleventh Amendment purposes); see also Gulledge v. Smart, 691 F. Supp. 947, 954-55 (D.S.C. 1988) (concluding that sheriffs and deputy sheriffs are agents of the state and cannot be sued in their official capacities), aff'd, 878 F.2d 379 (4th Cir. 1989) (table). Accordingly, the court finds that the plaintiff's claims against Brian Elliott and Sheriff Matthews in their official capacities and against the Kershaw County Sheriff's



Office[4] should be dismissed.  Consequently, Brown's § 1983 claims are only cognizable against Brian Elliott and Sheriff Matthews in their individual capacities.

### 2. Fourth Amendment Excessive Force Claim

A claim that a law enforcement officer has used excessive force during an arrest, investigatory stop, or other seizure of a person is properly analyzed under the reasonableness standard of the Fourth Amendment to the United States Constitution.  Graham v. Connor, 490 U.S. 386, 394-95 (1989).  The Fourth Amendment test is an objective one; however, it is not capable of precise definition or mechanical application.  Id. at 396-97.  It requires the court to determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Id. 397; see also Yates v. Terry, 817 F.3d 877, 884-85 (4th Cir. 2016); Yarborough v. Montgomery, 554 F. Supp. 2d 611, 617 (D.S.C. 2008).  The court must balance " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the importance of the governmental interest alleged to justify the intrusion."  Yarborough, 554 F. Supp. 2d at 617 (quoting Graham, 490 U.S. at 396); see also Yates, 817 F.3d at 884-85.

Courts must examine the totality of the circumstances in determining whether the force used was objectively reasonable.  Yates, 817 F.3d at 885.  Therefore, application of this standard "requires careful attention to the facts and circumstances of each particular case."  Graham, 490 U.S. at 396;

---

[4] Moreover, Kershaw County is a separate and distinct entity from the Kershaw County Sheriff's Office.  See Edwards v. Lexington Cty. Sheriff's Dep't, 688 S.E.2d 125, 127 n.1 (S.C. 2010) ("[U]nder South Carolina law, the sheriff and sheriff's deputies are State, not county, employees."); Gulledge, 691 F. Supp. at 954-55 (same).  Accordingly, Kershaw County cannot be held liable for the actions of the Kershaw County sheriff or his deputies, and the court finds the plaintiff's claims against this defendant should be dismissed.



see also Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003). In Graham, the Supreme Court established several factors to consider, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Yates, 817 F.3d at 885 (quoting Graham, 490 U.S. at 396). Courts must view the evidence " 'in full context, with an eye toward the proportionality of the force' in light of all the circumstances." Yates, 817 F.3d at 883 (quoting Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.

"[T]he right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. at 396; see also Yarborough, 554 F. Supp. 2d at 617. "This right is obviously greater when the suspect is resisting arrest and refusing to comply with the officer's orders." Yarborough, 554 F. Supp. 2d at 617. However, "notwithstanding probable cause to seize a suspect, an officer may not always do so by killing him." Tennessee v. Garner, 471 U.S. 1, 9 (1985). "The intrusiveness of a seizure by means of deadly force is unmatched"—thus, the United States Supreme Court has made clear that police officers may use deadly force to prevent the escape of an apparently unarmed felon only when (1) it is necessary to prevent an escape and (2) the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others. Id. at 9-11.

Qualified immunity shields governmental officials performing discretionary functions from liability for damages to the extent that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457



U.S. 800, 818 (1982). To resolve a qualified immunity defense, the court must (1) determine whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendants' conduct violated a constitutional right, and (2) determine whether the right was clearly established at the time of the alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 231-32 (2009). Courts may address the two prongs of the qualified immunity analysis in whichever order is appropriate in light of the circumstances of the particular case at hand. Id. at 235, 242.

In determining whether the right violated was clearly established, the court defines the right "in light of the specific context of the case, not as a broad general proposition." Parrish v. Cleveland, 372 F.3d 294, 301 (4th Cir. 2004) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). "If the right was not clearly established in the specific context of the case—that is, if it was not clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted—then the law affords immunity from suit." Id. (citations and internal quotation marks omitted). Moreover,

> [a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.

Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (first alteration added). In analyzing this prong, a court in this district generally must look only to case law from the United States Supreme Court, the Court of Appeals for the Fourth Circuit, and the South Carolina Supreme Court. Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999). The "salient question" " 'is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged

[conduct] was unconstitutional.' " Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)).

Moreover, "[w]hen a court addresses qualified immunity in the summary judgment context, it can condense its analysis." Pittman v. Nelms, 87 F.3d 116, 119 (4th Cir. 1996). The court need not determine directly whether the plaintiff's evidence shows a constitutional violation, because it can combine the two prongs of the qualified immunity inquiry by asking whether "the plaintiff has 'allege[d] the violation of a *clearly established* constitutional right.' " Id. (quoting Siegert v. Gilley, 500 U.S. 226, 231 (1991)) (alteration and emphasis in original). If so, the court must then determine whether the defendant knew or should have known that his conduct was illegal. Id. (citing DiMeglio v. Haines, 45 F.3d 790, 795 (1995)). The Fourth Circuit has described this inquiry as whether "a reasonable official would understand that what he is doing violates" the Constitution. Waterman v. Batton, 393 F.3d 471, 476 (4th Cir. 2005) (quoting Saucier, 533 U.S. at 202). "Although the exact conduct at issue need not have been held unlawful for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest." Id. (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987); Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992)).

In the case at bar, the plaintiff argues that genuine issues of material fact preclude summary judgment for the defendants. Stated broadly, the plaintiff essentially argues that a genuine issue exists as to whether Officer Elliott's professed fear for his safety was reasonable. More specifically, the plaintiff points to various discrepancies or inconsistencies in the record to support her position that a dispute exists as to whether Officer Elliott was being dragged by the truck or voluntarily running alongside it. (Pl.'s Mem. Opp'n Summ. J. at 10-14, ECF No. 36 at 10-14.) For example,



she argues that Officer Elliott's version of events is not credible for various reasons. First, she contends that he provided inconsistent statements as to how he was trapped in the passenger window frame of the truck. (Id. at 10.) She further points out that Herbert, the driver of the truck,[5] testified in his deposition that he could not see how Officer Elliott was trapped in the window. (Id. at 11.) She presents expert witness testimony from an engineer that Officer Elliott's story as to how he was trapped in the window is inconsistent with principles of physics. (Id.) And she attempts to cast doubt on Officer Elliott's believability by pointing out the unlikelihood that someone whose leg and foot had been run over would have such minor injuries. (Id. at 12-13.) All of these discrepancies, she argues, create a factual dispute precluding summary judgment and application of qualified immunity because, she contends, if Officer Elliott was actually hanging on to the truck rather than being trapped, then the threat to his safety was of his own making and not attributable to Lawhorn. In that event, Officer Elliott's use of deadly force would contravene Garner, since he would not have

---

[5] Although the plaintiff seems to suggest that Herbert's conduct as the driver, not Lawhorn's, should be the focus of the analysis, (see Pl.'s Mem. Opp'n Summ. J. at 7, 9, & n.1, ECF No. 36 at 4, 7, & 9), this argument wholly disregards that officers apparently had probable cause to believe that Lawhorn was engaging in drug trafficking and were surveilling him for that at the time of these events. See Moody v. City of Newport News, Civil No. 4:14cv99, 2016 WL 3453652, at *12 (E.D. Va. June 16, 2016) ("[D]etermination of the 'severity of the crime at issue' includes consideration of the possible serious impending criminal activity that [the officer] reasonably-perceived, in addition to crimes that have already taken place.") (citing Anderson v. Russell, 247 F.3d 125, 132 (4th Cir. 2001)). It also flies in the face of all the record evidence that after Herbert initially stopped the truck, Lawhorn moved or pushed him out of the way and drove the truck himself. Nothing in the record suggests that Herbert put the car in motion himself and no reasonable jury could find that he did. Furthermore, for the same reasons more fully explained below, any pre-seizure conduct by Herbert is irrelevant to the required inquiry under controlling precedent, which focuses on the moment the deadly force is employed. Finally, whether it was Herbert or Lawhorn who placed the truck in motion while Officer Elliott was leaning inside it is beside the point, because even if Lawhorn was an innocent passenger and Herbert was the one driving at the moment force was employed, courts have found officers to be entitled to qualified immunity in such scenarios even when it is a passenger rather than the suspect who is injured. See Pittman, 87 F.3d at 116.



had probable cause to believe that *Lawhorn* presented a significant threat of death or serious physical injury. Further, the plaintiff argues, any danger to Officer Elliott was of his own creation because during his encounter with Herbert and Lawhorn he failed to follow best practices as described by the plaintiff's expert witness in police procedures. (<u>Id.</u> at 17-18; Tucker Dep.14:24-15:14, 23:18-24, 35:15-24, ECF No. 36-17 at 6, 8, & 11.) After carefully reviewing the record and applicable law, however, the court concludes, for the following reasons, that even assuming the evidence that the plaintiff relies upon is sufficient for a reasonable jury to accept the plaintiff's theory of events,[6] this dispute of fact is not a material one under controlling law.

     Particularly instructive and, the court views, controlling here, is the decision of the United States Court of Appeals for the Fourth Circuit in <u>Greenidge v. Ruffin</u>, 927 F.2d 789 (1991). In <u>Greenidge</u>, a passenger in a vehicle that was the target of a prostitution arrest was shot by the defendant police officer. Officer Ruffin, a member of the vice squad, saw a woman whom she believed to be a prostitute enter a vehicle with a man. Officer Ruffin, in plain clothes and an unmarked car, ultimately approached the vehicle and observed an illegal sex act in progress. She opened the door of the car, identified herself as a police officer, and ordered the two occupants to place their hands in view. Neither complied, so Officer Ruffin drew her weapon. When she saw Greenidge reach for a long, cylindrical object from behind the seat, she fired, permanently injuring him. At trial, the district court excluded evidence that Officer Ruffin violated standard police

---

[6] Although the court accepts the plaintiff's theory of events as true for purposes of the qualified immunity analysis, it observes that the plaintiff does not support her version of events with any evidence from eyewitnesses or tangible evidence; rather, it largely depends on her convincing a fact finder that Officer Elliott is lying about what happened.

Page 11 of  20



procedures for night time prostitution arrests by not employing proper backup and by not using a flashlight. See generally Greenidge, 927 F.2d at 790-91.

On appeal, the Greenidge Court began by observing that the Supreme Court's decision in Graham instructs that the proper point in time to judge the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene is at the moment when the decision to use force was made. The Greenidge Court emphasized that Graham requires reasonableness to be judged without the benefit of 20/20 hindsight, and that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 791-92 (quoting Graham, 490 U.S. at 396-97). The Greenidge Court then concluded that "the Graham decision contradicts appellants' argument that, in determining reasonableness, the chain of events ought to be traced backward to the officer's misconduct of failing to comply with the standard police procedures . . . ." Id. at 792. The Greenidge Court therefore determined that the officer's alleged violation of police procedures, which arguably created the dangerous situation in which she found herself, was properly excluded as evidence. "[T]he officer's 'liability [must] be determined *exclusively* upon an examination and weighing of the information [she] possessed *immediately prior to and at the very moment [she] fired the fatal shot.*" Id. at 792 (quoting Ford v. Childers, 855 F.2d 1271, 1275 (7th Cir. 1988)).

Five years later in Elliott v. Leavitt, 99 F.3d 640 (4th Cir. 1996), the Fourth Circuit reaffirmed this approach. In that case, the plaintiff was arrested for driving while intoxicated and was handcuffed and placed in the front passenger seat of the police car with the seatbelt fastened, the door closed, and the window up. While the officers were talking outside the car, one of them



noticed a movement and looked to find the arrestee with his finger on the trigger of a small handgun aimed at the officers. When he did not obey commands to drop the gun, the officers shot and killed him. Again emphasizing that the court's focus must be on the circumstances at the moment force was used and that "officers on the beat are not often afforded the luxury of armchair reflection," the Elliott Court reversed the district court's refusal to grant the officers qualified immunity. The court rejected the argument of the parents who lost their son in the fatal shooting that their son did not pose a real threat to the officers because his hands were handcuffed behind his back and he was in the passenger seat with the seatbelt fastened and the window up. The court further rejected the district court's suggestion that the officers, who were outside the car, could simply have moved farther away. The court found such a suggestion to constitute "exactly the type of judicial second look that the case law prohibits" and "more reflective of the 'peace of a judge's chambers' than of a dangerous and threatening situation on the street." Elliott, 99 F.3d at 643 (quoting Graham, 490 U.S. at 396.) Significantly, the Elliott Court expressly disregarded the fact that the officers searched the suspect only cursorily before placing him in the car. Citing Greenidge, the court determined that such missteps by the officers prior to the moment force was employed were irrelevant to the excessive force inquiry. Id. at 643-44.

Here, viewing the reasonableness of Defendant Elliott's actions at the appropriate moment reveals no material dispute of fact. Even accepting the plaintiff's theory of events as true, all witnesses on the scene agree, and the plaintiff has not identified any evidence in the record to the contrary, that Lawhorn drove the vehicle away *after Elliott was leaning substantially inside it.* (Elliott Dep. 50:5-24, ECF No. 36-1 at 11; Herbert Dep. 18:10-15, ECF No. 28-4 at 7; Sellers Dep. 28:9-29:6, ECF No. 36-3 at 3-4; Threatt Dep. 35:6-15, ECF No. 28-5 at 6.) Whether Elliott was



voluntarily there or trapped matters not, since once Lawhorn put the vehicle in motion with Elliott leaning inside, Lawhorn indisputably presented a substantial threat to Elliott.[7] Whether Elliott contributed to the dangerousness of the situation by leaning into the truck to grab Lawhorn or by continuing to struggle with Lawhorn rather than detaching himself from the vehicle (if, indeed, he could have) is irrelevant to the analysis.[8] See Greenidge, 927 F.2d at 792; Drewitt v. Pratt, 999 F.2d 774, 780 (4th Cir. 1993). All of the evidence in the record is consistent that Lawhorn placed Elliott in danger by recklessly pushing the driver aside and then placing the truck in motion while Elliott was leaning in through the passenger window. (Elliott Dep. 42:11-43:18, ECF No. 28-2 at 25, 50:5-24, ECF No. 36-1 at 11; Herbert Dep. 18:10-15, 22:7-13, ECF No. 28-4 at 7, 9; Sellers Dep. 28:9-29:6, ECF No. 36-3 at 3-4; Threatt Dep. 33:10-22, 35:6-15, ECF No. 28-5 at 4, 6.) As discussed more fully below, based on the state of the law at the time, Elliott could reasonably have believed at that moment that both Garner elements were met, that the Graham factors all weighed in his favor,[9] and that he was not violating the Fourth Amendment's proscription against excessive force by shooting.

---

[7] See Willis v. Oakes, 493 F. Supp. 2d 776, 783 (W.D. Va. 2007) (rejecting the plaintiff's claim that factual disputes precluded summary judgment, finding that "[e]ven if the door was closed and only Deputy Yost's arm was inside the Tahoe through an open window, it was still objectively reasonable for Deputy McNally to believe that Deputy Yost and other persons were in danger" when the driver of the car was struggling with police at the driver's side of the vehicle and the driver put the key in the ignition and the gearshift in drive).

[8] "A police officer's pre-seizure conduct, regardless of whether it was ill-advised or violative of law enforcement protocol, is generally not relevant for purposes of an excessive force claim under the Fourth Amendment which looks only to the moment force is used." Gandy v. Robey, 520 F. App'x 134, 142 (4th Cir. 2013).

[9] "Of course, the critical reality here is that the officers did not have even a moment to pause and ponder these many conflicting factors." Waterman v. Batton, 393 F.3d 471, 478 (4th Cir. 2005) (citing Graham, 490 U.S. at 396-97).



This conclusion is further supported by other decisions within this circuit in similar factual scenarios—specifically, cases where a suspect presents a danger to a law enforcement officer with a vehicle.[10] In Pittman v. Nelms, 87 F.3d 116 (4th Cir. 1996), the Fourth Circuit addressed a factual situation similar to the one in the case at bar. There, the plaintiff was injured when two officers, Nelms and Banks, attempted to stop a vehicle driven by a suspected drug dealer. The two officers approached the vehicle from opposite sides. Officer Banks leaned into the driver's side window to speak to the suspect, and the suspect began to drive away. Banks's arm was caught in the open window and he was dragged twenty-five to thirty feet before the car swerved to the right and released his arm. The other officer then fired at the car and the bullet struck a passenger in the back seat. The Fourth Circuit held that the officers were entitled to qualified immunity.

Drewitt v. Pratt, 999 F.2d 774 (4th Cir. 1993), also involved similar facts. There, the defendant police officer, Pratt, was serving off duty as a security guard at Pizza Hut. When employees reported to Pratt that a vehicle was being driven recklessly, he investigated and observed Drewitt drive with no headlights, collide with a parked truck, and attempt to drive away. Pratt, intending to arrest Drewitt for reckless driving, ran toward the vehicle with his service revolver drawn, yelling that he was a police officer and commanding Drewitt to stop. Pratt was not in uniform and did not display his badge. The vehicle initially stopped and Pratt crossed in front of the car toward the driver's side. The vehicle's headlights were then activated and the car accelerated forward, striking Pratt, who maneuvered onto the hood. While on the hood of the vehicle, Pratt fired

---

[10] The court finds the cases discussed below to be more on point than the one relied upon by the plaintiff. Krein v. Price, 596 F. App'x 184 (4th Cir. 2014), is distinguishable because at issue there was the second shot fired by officers, after some evidence suggested they were then out of harm's way. Notably, the parties did not dispute that the defendant officer's first shot, fired when the vehicle was in motion and heading toward the officer, was objectively reasonable.



into the windshield. The gun discharged again as Pratt fell off the hood. Both bullets struck Drewitt. Drewitt, who was intoxicated at the time, later testified that he recalled very little about the events.

The Fourth Circuit held that Pratt was entitled to qualified immunity. The court noted various factual disputes in the record, but concluded, as the court does here, that those disputes were not material. The court again found that disputed facts about Pratt's actions leading up to the shooting, such as whether he properly identified himself as police and displayed his badge, related only to the issue of whether his arrest procedures were proper, and was "irrelevant to the issue of whether at the moment of the shooting Officer Pratt had probable cause to believe that Drewitt posed a threat of death or serious bodily harm to him." Drewitt, 999 F.2d at 780. In discussing prior case law, including Greenidge, the Drewitt Court rejected the plaintiff's suggestion that in violating standard arrest procedure, the officer recklessly created a dangerous situation during the arrest or manufactured the circumstances that gave rise to the fatal shooting. Id. at 779.[11]

The court's conclusion that the defendants are entitled to qualified immunity is further buttressed by the recent district court opinion addressing similar facts in Moody v. City of Newport News, Civil No. 4:14cv99, 2016 WL 3453652 (E.D. Va. June 16, 2016), appeal docketed, No. 16-1814 (4th Cir. July 19, 2016). In Moody, an officer conducting a traffic stop and preparing to arrest a suspected drug dealer was leaning into the window of the vehicle when the suspect released the emergency brake and attempted to shift his vehicle into gear. Other officers on the scene fired and

---

[11] More recently, in Waterman v. Batton, 393 F.3d 471 (4th Cir. 2005), the Fourth Circuit again reversed the district court for denying qualified immunity to officers in a traffic stop shooting where officers could reasonably have believed a fleeing driver, ignoring police commands to stop while proceeding slowly through a toll plaza, would hit them with his car in light of the undisputed facts that the vehicle lurched forward, accelerating in the general direction of the officers, forcing officers to decide if driver was attempting to assault officers, and the information officers heard over the radio that the suspect had already tried to use his vehicle as a weapon against another officer.



shot the suspect. The court held both of the defendant officers were entitled to qualified immunity. Notably, the court found that on the date of the incident, December 12, 2012, "the state of the law did not provide [the officer who shot the plaintiff] with 'fair warning' that his conduct violated a constitutional rule." Moody, 2016 WL 3453652, at *16. In addition to relying on a 2004 United States Supreme Court case that it considered "analogous,"[12] the court in Moody expressly cited Pittman, Waterman, and Elliott in determining that the state of the law in 2012 did not clearly establish the unconstitutionality of the officer's conduct. Id. at *16-17 & n.23 ("Pittman is applicable to the case at bar as it reflects the state of the law in existence at the time that [the defendant officer] shot. Further, Pittman, as a published case in the Fourth Circuit, provides relevant precedent that [the officer] could rely on to give him 'fair warning' of what conduct might be allowed or prohibited under the Fourth Amendment."). This court similarly finds that Pittman is applicable here, and that at the time Defendant Elliott shot Lawhorn in February 2012, the state of the law was not clearly established that his conduct would violate the Fourth Amendment.

"The Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm." Elliott v. Leavitt, 99 F.3d 640, 641 (4th Cir. 1996) (Wilkinson, C.J.). "[N]o court can expect any human being to remain passive in the face of an active threat on his or her life. . . . [T]he Fourth Amendment does not require omniscience. Before employing deadly force, police must have sound reason to believe that the suspect poses a serious threat to their safety or the safety of others. Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm—the Constitution does not require that certitude precede the act of self protection." Id. at 644. The defendants are therefore protected by qualified immunity.

---

[12] Brosseau v. Haugen, 543 U.S. 194, 198-200 (2004) (*per curiam*).



The court recognizes the tragedy and misfortune resulting from the tumultuous events of February 28, 2012. Although the outcome was certainly more fortunate for Officer Elliott than for Lawhorn, the state of the law at that time did not require Elliott to wait until he was detached from the truck without serious injury befalling him to decide whether to use deadly force.

### 3.     Plaintiff's "Deliberate Indifference" Claim

The plaintiff also raises a claim of "deliberate indifference" under § 1983. In the Complaint, the plaintiff's deliberate indifference claim appears to seek to establish municipal liability for failure to train. See City of Canton v. Harris, 489 U.S. 378, 388 (1989) (providing that, under a theory of municipal liability pursuant to Monell, a plaintiff may show that a municipality's failure to train its employees amounts to a deliberate indifference to the rights of persons with whom the untrained employees come into contact). However, such a theory of municipal liability is not cognizable against any of the named defendants because they are not municipalities. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, n.54 & n.55 (1978) (providing that municipal liability under § 1983 is "limited to local government units which are not considered part of the State for Eleventh Amendment purposes," and noting that "since official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent—at least where Eleventh Amendment considerations do not control analysis—our holding today that local governments can be sued under § 1983 necessarily decides that local government officials *sued in their official capacities* are 'persons' under § 1983 in those cases in which, as here, a local government would be suable in its own name.") (emphasis added); see also Goodman v. Harris Cty, 571 F.3d 388, 394-96 (5th Cir. 2009) (discussing the difference between individual or "personal" capacity suits and municipal liability). And finally, while Kershaw County is a local government subject to municipal

Page 18 of 20



liability under § 1983, as discussed previously, Kershaw County is separate and distinct from the Kershaw County Sheriff's office and its deputies, which are arms of the state, and accordingly, Kershaw County as an entity cannot be held liable with regard to this incident. See Gulledge, 691 F. Supp. at 954-55.[13]

## RECOMMENDATION

For the foregoing reasons, the court concludes that the plaintiff's federal claims fail as a matter of law. Accordingly, the court recommends that the defendants' motion for summary judgment be granted as to the federal claims, and that the state law claims be remanded to state court pursuant to 28 U.S.C. § 1367(c).

_____
Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

July 20, 2016
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

---

[13] In her response to the motion for summary judgment, the plaintiff also appears to argue in support of a claim for supervisory liability against Sheriff Matthews. (ECF No. 36 at 29); see generally Shaw v. Stroud, 13 F.3d 791 (4th Cir. 1994). However, the plaintiff did not appear to expressly raise a claim for supervisory liability in her pleadings. Therefore, such a claim would not be properly before the court. See White v. Roche Biomedical Labs., Inc., 807 F. Supp. 1212, 1216 (D.S.C. 1992) (holding that "a party is generally not permitted to raise a new claim in response to a motion for summary judgment"); see also Bridgeport Music, Inc. v. WM Music Corp., 508 F.3d 394, 400 (6th Cir. 2007) (holding that a party may not expand its claims to assert new theories in response to summary judgment). Moreover, in light of the court's conclusion that the defendants are entitled to qualified immunity, such a claim would fail in any event. Shaw, 13 F.3d at 801 (stating that for a plaintiff to show that a defendant is not entitled to qualified immunity on a supervisory liability claim, the plaintiff must prove, *inter alia*, that it was clearly established at the time that the subordinate's acts were unconstitutional).

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' "  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Robin L. Blume, Clerk
> United States District Court
> 901 Richland Street
> Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).